UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JOSEPH H. PASTURES, JR.,

Plaintiff,

v.  408CV108

JOHN E. POTTER, *Postmaster General of the United States*,

Defendant.

## ORDER

### I. Introduction

Plaintiff Joseph Pastures complains that his former employer, John E. Potter ("Defendant"), Postmaster General of the United States Postal Service ("Postal Service"), discriminated against him in violation of the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act of 1990 ("ADA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"), in favor of employees who are younger than him, white, female, and/or non-disabled. *See* doc. ## 1, 7, 9 & 18. Before the Court is Defendant's motion for summary judgment, filed pursuant to F.R.Civ.P. 56. Doc. # 32.

### II. Background

According to the uncontested statements of fact submitted by the parties, doc. ## 32-3, 35 & 36, the facts of this case are as follows:

Joseph Pastures was employed by the Postal Service for over twenty-four years. Doc. # 32-3 at 1. At the time of his termination in 2006, he was working as a full-time "mail handler, level 4" at the Postal Service's Savannah, Georgia Processing and Distribution Center ("P&D Center"). *Id.* at 1-2.

On 9/29/04, Pastures was issued an official letter of warning for his failure to follow instructions, based on an incident wherein he left the plant without permission while he was still on the clock. Doc. # 32-2 at 1. The letter states that Pastures had been instructed several times not to leave the facility while on the clock, and it includes a warning to Pastures that any future misconduct would result in harsher disciplinary actions, including suspensions, reduction in grade and/or pay, or removal from the Postal Service. *Id.*

In February 2006, after being informed by a manager at the P&D Center that Pastures had been clocking in his co-worker Willadean Williams and clocking out another co-worker, Wanda Beckett, the Postal Service Office of the Inspector General initiated an investigation. Doc. # 32-3 at 9. The Employment and Labor Relations Manual, which is given to all employees, instructs employees that recording the time for another employee constitutes falsification of a report, and any employee knowingly involved in such conduct would be subject to removal or other discipline. *Id.* at 9-10. In March, the Inspector General questioned Pastures about clocking co-workers in and out, and also about another report that Williams had been clocking Pastures in prior to the actual start of his shifts so that he could receive overtime pay for hours he did not work. *Id.* at 10. During his interview, Pastures denied ever having Williams clock him in but stated that he "didn't clock in other employees very often." Doc. # 32-2 at 9 (Keith affidavit). During the interview, Pastures executed a sworn document containing an admission that he had clocked in a friend, as well as the following hand-written statement: "I Joseph Pastures clock on a friend ... I feel very bad about this because ... the trouble it caused. It will never

hap[p]en again."[1] *Id.* at 3 (copy of sworn statement). Following the interview, Pastures was placed on emergency suspension by the Postal Service. Doc. # 32-3 at 10.

During the course of the investigation, Williams and Beckett were also interviewed by the Inspector General. *Id.* at 11. During her interview, Williams admitted to clocking Pastures in and out from time to time. *Id.* She also stated that she deserved the overtime pay that she received as a result of Pastures clocking her in early. *Id.*

The Inspector General also reviewed time records for the three employees, which revealed that Pastures had clocked in Williams on at least one occasion. *Id.* Pastures continued to deny that he ever clocked Beckett in or out. *Id.*

In early April 2006, Pastures' immediate supervisor, Robert Day, informed Pastures that he had issued a letter proposing his termination based on the charges of falsification in recording time. *Id.* at 12. In July 2006, Eric Keith, who had recently been appointed as plant manager for the Savannah P&D Center,[2] issued the final decision removing Pastures from his employment with the Postal Service. *Id.* at 3-4, 12. Keith likewise determined that Williams should be removed from Postal Service employ.[3] *Id.* at 12 Notably, however, Keith offered both employees the option of resigning in lieu of removal. *Id.* While Williams chose to resign, Pastures declined the opportunity and, instead, was terminated. *Id.*

After his termination, Pastures filed a complaint with the Equal Employment Opportunity Commission (EEOC), alleging that he was discriminated against "on the bases of race (African-American), sex (male), disability (diverticulitis), and age (51) when he was removed from his Mail Handler position for falsification in recording time." Doc. # 1 at 7 (EEOC decision). After his charge was denied, Pastures filed this suit against Defendant, alleging the same discrimination claims that were denied by the EEOC. *See* doc. ## 1 (application), 7 (complaint), 9 (first amended complaint) & 18 (second amended complaint).

Presently before the Court is Defendant's motion for summary judgment as to all of Pastures' claims. Doc. # 32. Pastures has responded to the summary judgment motion. Doc. ## 35 & 36 (amended response). Within his response, he has additionally moved the Court to impose sanctions against Defendant because he claims Defendant has committed "a clear defalcation ... in deleting or failing to state the grounds for demotion of [another Postal Service employee] in his employment

---

[1] Additionally, Pastures affirmatively states in his statement of material facts that he "'clocked' in a friend who was not physically present at the workplace...." Doc. # 35 at 1.

[2] Keith moved to Savannah from Florida and assumed the role of plant manager in Savannah on February 16, 2006, some ten days after the Inspector General received information regarding Pastures' alleged misconduct. Doc. # 32-2 at 7 (Keith affidavit).

[3] It was determined that Beckett's misconduct did not warrant the harsh sanction of termination because having someone else clock her out had not resulted in the collection of any unearned (regular or overtime) pay. Doc. # 32-3 at 13. Instead of taking her half-hour lunch break in the middle of her shift, Beckett would work through her entire shift and take her break at the end of her shift, while she sat in her car in the plant's parking lot. *Id.* Because she did not want to return inside at the end of her break to clock out, she would often have another employee inside the plant clock her out at the end of her shift. *Id.* She was thus disciplined only for having someone else clock her out (and not for collecting pay that she had not actually earned), and she was given a thirty-day suspension from duty. *Id.*

record," which, he claims, "reeks of a cover-up of discrimination." Doc. # 36 at 3.

### III. Legal Principles

Summary judgment is appropriate where the evidence before the Court shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(c)(2). In determining whether summary judgment is appropriate, the facts and inferences from the record are viewed in the light most favorable to the non-moving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

Nonetheless, "[a]lthough reasonable inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party, that party 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment' to show that there is a genuine issue for trial." *Tidmore v. BP Oil Co./Gulf Prods. Div.*, 932 F.2d 1384, 1387 (11th Cir. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). A mere scintilla of evidence supporting the non-moving party's position will not fulfill its burden. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Likewise, mere speculation cannot sustain opposition to a party's summary judgment motion. *See Howard v. Oregon Television, Inc.*, 276 Fed. Appx. 940, 941 (11th Cir. 2008) (unpublished) ("Speculation does not create a *genuine* issue of fact.") (quotations and citation omitted); *Huggins v. Teamsters Local 312*, 585 F. Supp. 148, 150-51 (E.D. Pa. 1984) ("[M]ere inferences, conjecture, speculation or suspicion are insufficient to establish a material fact upon which to base the denial of summary judgment.").

Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA provides similar protections for those discriminated against because of their age. 29 U.S.C. § 621, *et seq.* A plaintiff alleging discrimination under either of the acts must show that the employer intended to discriminate against him because of his membership in a particular protected group. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."). Where, as here, a plaintiff produces no direct or statistical evidence of discrimination, he must rely on circumstantial evidence from which an inference of intentional discrimination may be drawn. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994). In such a case, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (applying framework in Title VII case); *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (applying the *McDonnell Douglas* framework to ADEA claims).

Under a common formulation of the *McDonnell Douglas* framework, to establish a prima facie case of discrimination, a plaintiff must show: "(1) that [he] belongs to a protected class; (2) that [he] suffered an adverse employment action; (3) that [he] and

a similarly situated non-protected person were dissimilarly treated; and (4) that the employment action was causally related to the protected status." *Alford v. Florida*, 390 F. Supp. 2d 1236, 1247 (S.D. Fla. 2005); *Perkins v. School Bd.*, 902 F. Supp. 1503, 1506-07 (M.D. Fla. 1995). Where the discrimination is alleged in the application of work rules to discipline an employee, and where there is no claim that the employee did not violate the work rules, as here,[4] then plaintiff must show "that he engaged in misconduct similar to that of a person outside the protected class, and ... the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Moore v. Alabama Dep't of Corr.*, 137 Fed. Appx. 235, 238 (11th Cir. 2005) (citing *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989)).

If the plaintiff succeeds in proving a prima facie case of discrimination, he has established a presumption of unlawful conduct. *Burdine*, 450 U.S. at 253-54 ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for plaintiff's rejection."). The defendants then have the burden of producing a legitimate, nondiscriminatory reason for the challenged employment action. *See id.* at 254 (emphasizing that a defendant's burden is one of production: "The defendant need not persuade the court that it was actually motivated by the proffered reasons...."). If a legitimate, nondiscriminatory reason is articulated by the defendant, the plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *Id.* at 256.

Finally, under the ADA, "[t]o establish a prima facie case of disability discrimination ... a plaintiff must show: (1) he is disabled, (2) he is a qualified individual, and (3) he was subject to unlawful discrimination because of his disability." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000); *accord LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224 (11th Cir. 1997); *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996).

## IV. Analysis

### A. Age and Sex Discrimination

Regardless of whether he meets the other three requirements for a prima facie case of discrimination under the *McDonnell Douglas* framework, Pastures' failure to show that he was treated dissimilarly to some similarly situated non-protected person stops his claims of age and sex discrimination dead in their tracks.[5]

---

[4] Notably, Pastures, who at times in this litigation has appeared to deny that he violated the workplace rule against falsification in recording time, *see* doc. # 32-1 at 30-31 (Pastures Depo.), now apparently concedes that he violated the rule on at least one occasion. First, he began his response to the summary judgment motion, with the following introductory statement: "On or about February and March[] 2006, the Plaintiff, a black male, "clocked" in a friend who was not physically present at the workplace, the United States Post Office, and for that action was terminated on or about October 31, 2006." Doc. # 35 at 1 (citing Plaintiff's Exh. 1 (Pastures Depo.) at 21). Additionally, in his response to the summary judgment motion, Pastures did not claim or attempt to prove that he never actually committed the rule violations upon which his termination was based.

[5] Defendant points out that Pastures has probably abandoned his claim of discrimination on the basis of sex. In his response to Defendant's first request for admissions, Pastures responded "Admitted" to Defendant's statement, "That in the [present] civil action ... the plaintiff Joseph H. Pastures has abandoned any and all claims of gender discrimination by the Postal Service." Doc. # 35-1 at 2. Additionally, Defendant has submitted a portion of Pastures' deposition transcript, wherein Pastures affirms that he has "abandon[ed] any claim that the Postal Service discriminated against [him] on the

4

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir. 1994)). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Id.* at 1562 (citations and emphasis omitted).

First, Pastures' age discrimination fails because he has not referenced a single individual allegedly younger than him, much less a similarly situated younger person treated more favorably. Neither Pastures' complaint (including all amendments to it) nor his response to the summary judgment motion indicates the ages (neither exact age in years, nor age with relation to Pastures) of any specific co-workers. Moreover, during his deposition, Pastures was unable to name any younger potential comparators:

> Q [by defense attorney]: Name for me one person that was your age or younger who was not fired for similar misconduct, time and attendance violations. Name as many as you know.
>
> A [by Pastures]: Mr. John Beasley.
>
> Q: Okay. And how old was he? He was younger than you in 2006?
>
> A: No, about the same age or older.
>
> Q: Okay. Who else?

> A: Jerry Griffin.
>
> Q: And how old was Mr. Griffin in 2006?
>
> A: Probably older, same or older.
>
> Q: Okay. Who else?
>
> A: Just them two.
>
> Q: Who younger than you, 50 – you were 51 in 2006?
>
> A: Uh-huh.
>
> Q: Name someone 51 or younger who was kept on at the Postal Service when they, similar to what you were accused of doing, violated time and attendance rules.
>
> A: The only one I can think of is Jerry Griffin and the – the ones I named.

Doc. # 32-1 at 19-20. Pastures has not presented evidence that any of the men he named were in fact younger than him when they were involved in allegedly similar misconduct, and, in his deposition, he expresses his own belief that they were "probably" or "about" his age or older. *See id.* As a result, Pastures has failed to carry his burden of proving a prima facie case, and summary judgment will be granted to Defendant on the age discrimination claim.

Likewise, Pastures has failed to meet his initial burden on his sex discrimination claim. In his response to the motion for summary judgment, Pastures does not present any female employee as a potential comparator. *See* doc. ## 35 & 36. In fact, throughout all of Pastures' pleadings filed with this court, only two co-workers are specifically identified as females – Williams and Beckett, who were involved in the same investigation as Pastures. Nonetheless, Pastures never argues that either woman was situated similarly to him yet treated more favorably than he was. And even if he did

---

basis of [his] gender...." Doc. # 32-1 at 15. Nonetheless, because Pastures has not informed the Court of any such abandonment, and because he so clearly fails to make a prima facie showing on the claim, the Court will address and dismiss the claim on its merits.

5

present such argument, he would not succeed. First, Beckett is not "similarly situated" to Pastures, since she did not engage in the same level of misconduct as Pastures. Although Beckett technically engaged in falsification by having someone else clock her out, she did not do so in order to collect unauthorized and unearned pay. Doc. # 32-3 at 13. As for Williams, even assuming she qualifies as "similarly situated," she and Pastures were treated identically for their misconduct: both were given the option to resign or be terminated. *Id.* at 12. As Pastures has not shown that he was treated dissimilarly to some similarly situated female, he cannot meet his burden of proving a prima facie case of sex discrimination.

### B. Disability Discrimination

Pastures has not established a prima facie case of discrimination based on disability. He states in his deposition that he is disabled by post-traumatic stress disorder ("PTSD"). Doc. # 32-1 at 27. However, Pastures has placed no medical evidence in the record tending to prove (1) that he actually suffers from PTSD and (2) that his PTSD (to the extent he may actually suffer from it) rises to the level of a disability.

First and foremost, Pastures has not presented any evidence tending to prove that he has in fact been diagnosed with PTSD. Even assuming, however, that Pastures suffers from PTSD, he has not shown that it qualifies as a disability under the ADA. "The ADA ... define[s] 'disability' as '(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citing 42 U.S.C. § 12102(2) and 34 C.F.R. § 104.3(j)(1)). Pastures has not urged (much less shown) that his PTSD has substantially limited any of his major life activities. *See id.* ("We are guided on this issue by the regulations promulgated by the [EEOC], which state that '[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'") (citing 29 C.F.R. § 1630.2(i)). Nor has he adduced evidence of a "record of such impairment." Additionally, Pastures has not shown that he was "regarded as having such an impairment." He admits that he had not yet been diagnosed with PTSD at the time he was terminated. Doc. # 32-1 at 4. And he has presented no evidence to indicate that the Postal Service – or any other individuals or groups – regarded him (or even perhaps should have regarded him) as having a disability at that time. As a result, he has not made a prima facie showing of discrimination on the basis of a disability, and summary judgment will be entered on the claim.

### C. Race Discrimination

Finally, the Court reaches Pastures' race discrimination claim, the only claim for which he has offered any purportedly similarly situated comparators. As discussed previously, Pastures "must show that ... comparator employees [were] involved in or accused of the same or similar conduct yet [were] disciplined in a different, more favorable manner." *Anderson*, 253 F.3d at 564.

Here, Pastures presents three Caucasian individuals whom he purports qualify as comparators: Jerry Griffin, Todd Woods, and John Beasley. Doc. # 35 at 1. According to Pastures' testimony,[6] Griffin,

---

[6] In order to support his claims, Pastures presents the following: (a) excerpts from his deposition, (b) redacted and unredacted copies of Griffin's entire personnel file (provided to Pastures by the Defendant), and (c) affidavits provided by two of

who at the time was a supervisor at the Savannah facility, either clocked Woods in or instructed Woods to clock himself in at the P&D Center. Doc. # 35 at 7-10, 14-17. Griffin then directed Woods to go to Griffin's home and do repair work on Griffin's personal vehicle. *Id.* When Griffin and Woods' misconduct was discovered, Griffin was demoted from his supervisor position to a "custodial" position, while Woods was merely required to prepare a written report regarding the incident. *Id.* at 7, 10. Meanwhile, Beasley, who worked at the Bingville facility (a different facility from the one where Pastures worked), was purportedly found to have clocked in a co-worker in 1996 and was given a thirty-day suspension from work as a result. *Id.* at 11-13.

In order for Griffin, Woods, and/or Beasley to qualify as comparators, the Court must be satisfied that their situations were sufficiently similar to that of Pastures. "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotations omitted); *see also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984) ("[T]he misconduct for which [the plaintiff] was discharged [must be] nearly identical to that engaged in by an employee outside the protected class whom the employer retained.") (quotations omitted).

The Court finds that none of the three men have been shown to qualify as a proper comparator for Pastures.

Woods was disciplined for conducting non-Postal Service related work while on the clock, not for clocking in others (and/or having others clock him in) so that unearned overtime pay could be collected. Although Woods may have been clocked in by another person, his absence from the P&D Center was compelled by the instructions of his supervisor. Furthermore, there is no evidence that Woods earned overtime hours and pay, above and beyond his normal work schedule, when he was clocked-in to do off-site work. Pastures' time-clock misconduct, on the other hand, did not involve the instructions (or even the cooperation) of a superior, and his misconduct allowed others (and possibly himself) to collect unearned overtime. Additionally, the Court puts some weight into the fact that different individuals

---

Pastures' co-workers. *See* doc. # 35 at 4-17. The value and admissibility of these documents and the testimony contained within them is questionable at best. First, despite filing some 300 pages of Griffin's personnel file for the Court's enjoyment, Pastures points to no particular information within those documents to specifically support his case. It is not the Court's responsibility to wade through documents to find evidence in support of a party's case, and the Court therefore declines to consider any part of the personnel file. Next, the sworn statements by Pastures' co-workers, describing the specific misconduct undertaken by (and punishment administered upon) Griffin and Woods, are of questionable admissibility, as they appear to be based upon little more than hearsay and workplace gossip. *See* doc. # 35 at 14-17 (Bryant & Bloomfield Affidavits) (Bryant states, "I am aware that ... Griffin was demoted from his position as supervisor to custodian for falsifying time records," and Bloomfield states, "I am familiar with these events because I worked at the same facility and was told by Mr. Woods what Mr. Griffin had done."); F.R.Evid. 602 (requiring that witnesses have personal knowledge of the matter about which they testify). Finally, during his deposition testimony, Pastures conceded that he lacked any first-hand personal knowledge about the misconduct of at least one of the alleged comparators. *See id.* at 8 (Pastures Depo.) ("Q: Do you have any personal knowledge of any misconduct committed by Mr. Woods that's similar to what you were accused of doing? ... A: No."). Nonetheless, since the affidavits and deposition testimony, even if given full weight and credit, do not present evidence regarding a single qualified comparator, the Court declines to make a determination on those documents' admissibility.

7

were in the supervisory roles when Woods was disciplined, making his situation even less comparable to Pastures'. *Gerwens*, 874 F.2d at 1541 ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1312 n.7 (11th Cir. 1998) ("Different supervisors may have different management styles that -- while not determinative -- could account for the disparate treatment that employees experience."). Keith and Day made the disciplinary decisions in Pastures' case. Day, however, was not Woods' supervisor when Woods was disciplined. Doc. # 35 at 7 (Pastures' testimony in his deposition that a man named "Benny," and not Day, was Woods' supervisor when he was disciplined). Likewise, Keith (who became plant manager at the P&D Center some ten days after Pastures' misconduct came to light) was not the plant manager at the time of Woods' misconduct in 1999. Doc. # 32-1 (Pastures' deposition) at 37. Finally, and perhaps most importantly, there is no evidence that Woods had been issued a warning or otherwise disciplined for any previous misconduct. This sets his situation at the time of his misconduct even further apart from that of Pastures', who, within the two years prior to his termination-inducing misconduct, had been reprimanded for a workplace rule violation and had been issued a written warning that future misconduct could result in his termination. Doc. # 32-3 at 2.

Griffin, likewise, is not a proper comparator in light of the sum of the differences between his situation and that of Pastures. First, Griffin was in a high-level supervisory position when his misconduct occurred, while Pastures was merely a mail handler. Logically, different factors come into play in disciplining employees at different levels of the management hierarchy, making an employee in a management position generally ill-suited to serve as a comparator for a lower-level employee. *See Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997) (noting the difficulty that plaintiffs in higher level supervisory positions have in finding employees who could be considered "similarly situated," as there are usually a more limited number of supervisory-level employees). Additionally, as with Woods, the Court puts some weight into the fact that different individuals made the disciplinary decisions regarding Griffin's misconduct. Doc. # 35 at 10 (Pastures' testimony that Griffin's supervisor when he was disciplined "might have been David Usher" but definitely was not Robert Day); *see also Gerwens*, 874 F.2d at 1541; *Bessemer*, 137 F.3d at 1312 n.7. Finally, and perhaps most importantly, there is no evidence that Griffin had been reprimanded for any misconduct in the past and warned that future misconduct could lead to his termination.

Lastly, while Beasley's misconduct was similar in many aspects to that of Pastures, he was not otherwise "nearly identically situated" to Pastures. First, Beasley worked in a different facility, the Bingville facility, which was separate from Pastures' facility, the P&D Center, and had its own separate and distinct staff and supervisors. Doc. # 35 at 31 (explaining that Beasley worked at a different facility, that Eric Keith was not the plant manager there, and that Robert Day did not supervise Beasley). As a result, a different and separate group of individuals made the particular disciplinary determinations regarding Beasley. *See Gerwens*, 874 F.2d at 1541; *Bessemer*, 137 F.3d at 1312 n.7. Additionally, Beasley's misconduct occurred in 1996, some ten years prior to Pastures' misconduct. The Postal Service's rules and disciplinary policies and attitudes have likely evolved over such a span of years. Moreover, as

8

with Woods and Griffin, the Court puts considerable weight into the fact there is no evidence that Beasley had been warned or otherwise disciplined for any previous misconduct, especially not within the two years preceding his at-issue misconduct.

As a result of Pastures' failure to present the Court with a suitable comparator, he has not made a prima facie showing of race discrimination. Summary judgment must therefore be entered as to that claim.

## V. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is *GRANTED* as to all of Pastures' claims. Doc. # 32. Pastures' Complaint is therefore *DISMISSED*. Doc. ## 1, 7, 9 & 18. Additionally, Pastures' motion for sanctions is *DENIED*. Doc. # 35, 36.

This day of 10 December 2009.

*[signature]*
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA